MARY DAY NURSERY, CHILDREN'S HOSPITAL, PLAINTIFF, *v.*
CITY OF AKRON AND BOARD OF COUNTY COMMISSIONERS OF
SUMMIT COUNTY, DEFENDANTS.

Common Pleas Court, Summit County.

No. 226705.   Decided November 1961.

458

Messrs. *Brouse, McDowell, May, Bierce & Wortman*, by Mr. *Frank E. Harvey, Jr.*, for plaintiff.

Mr. *Harry N. VanBerg*, director of law, and Mr. *Sal Germano*, assistant director of law, for defendant, City of Akron.

Mr. *John S. Ballard*, prosecuting attorney, by Mr. *John D. Smith*, assistant prosecuting attorney, for defendant, Board of County Commissioners.

## Introduction

CARIS, J.   The plaintiff-hospital, an Ohio corporation not for profit, operating a hospital in the City of Akron brings this suit against the City of Akron, a municipal corporation, and the Board of County Commissioners of Summit County, Ohio, a quasi-public corporation, for the recovery of certain hospital care for an alleged indigent patient, claiming that one Lorain Miller, an indigent minor child, is eligible for poor relief under the law of the State of Ohio and that on March 22, 1960, the said minor child had been brought to its hospital for emergency treatment.   The plaintiff claims that it complied with all the conditions precedent to fixing the liability of the defendants for hospital services and care rendered to said infant. Upon this hospitalization, the plaintiff alleges, the child remained for emergency services and treatment until March 26, 1960, as alleged, or March 28 as stipulated.

Plaintiff further asserts that on or about July 20, 1960, it

again admitted said infant to its hospital for emergency treatment and again complied with the aforesaid conditions precedent, and that the child remained in its hospital for necessary emergency services and treatment until July 26, 1960.

Plaintiff claims further that the said infant was born June 13, 1957, as the illegitimate child of one Equilla Miller, who then lived in the City of Peoria in the State of Illinois, and that while said child was but a few weeks old the said Equilla Miller, its mother, placed it with one Betty Roberts, the great-aunt of the child, living at 728 Diagonal Road in the City of Akron, Ohio. The plaintiff further alleges that this great-aunt, Betty Roberts, has received no compensation for caring for said infant and that she, Betty Roberts, stands in the place of parent to the infant, and the plaintiff claims judgment for these two periods of hospital care.

The defendant, the City of Akron, has answered, admitting its corporate character and otherwise denying the claims of the plaintiff, further asserting affirmatively that Equilla Miller, the mother of the infant in question, has not now nor ever had a legal settlement in the State of Ohio.

The defendant, the Board of County Commissioners of Summit County, Ohio, filed an answer setting forth as a first defense that the plaintiff has not exercised its statutory remedy by way of appeal from the decision of the defendant or its agents on the determination of eligibility of the infant for poor relief.

Further the defendant-County Commissioners by way of answer denies that the infant is an indigent minor child eligible for poor relief under the laws of this state; denies that the plaintiff has complied with all conditions precedent to imposing liability on the answering defendant; denies that plaintiff admitted to its hospital said infant on or about March 22, 1960, for services and treatment until on or about March 26, 1960, and again on or about July 20, 1960, until July 26, 1960.

Further, the Board denies that the infant was born June 13, 1957, as the illegitimate child of Equilla Miller living in the City of Peoria aforesaid, and denies further that while said child was but a few weeks old the mother delivered said child to Betty Roberts aforesaid and denies that said Betty Roberts,

the great-aunt, was without compensation for caring for this infant. Further, the answering defendant makes general denial.

On the issues so made up, the case was on October 18, 1961, submitted to this Court.

### Finding of Facts

The Court finds that Lorain Miller at trial time was an infant of about the age of three years and was born in Peoria, Illinois, the illegitimate child of one Equilla Miller who resided there, about June 13, 1957. About three weeks after the birth of the infant her mother brought her to Betty Roberts, a great-aunt, and entered into a contract with Betty Roberts, alleging the mother's inability to support the child, by which Betty Roberts agreed to keep the child and care for the same as though it was her own child. The mother, in the contract, agreed to seek employment and pay the aunt for the care and keep of the child at the rate of One Dollar per day beginning July 17, 1957 (Plaintiff's Exhibit 7). No compensation whatsoever was paid to Betty Roberts for the care of the child although she has continuously, up to the date of the submission of this action, cared for the child as her own; disciplining the child, giving it her love and affection and providing it with all necessaries of every kind save and except the hospitalizations, which are the subject of this action. The mother left these parts within two or three weeks without stating her destination or honoring her contract. It may be presumed she returned to Peoria, but in any case her whereabouts are ever since unknown.

It is clear from the evidence that said Betty Roberts stood in loco parentis to said child. Betty Roberts, herself, has never claimed any poor relief either for herself or for the infant in question save such hospitalizations.

On March 21, 1960, as Mrs. Roberts was bathing the child, the child began to cry and to turn her head from side to side. Mrs. Roberts then noticed that the child's mouth was pulled over to one side and she called the plaintiff hospital who advised her to bring the child to the hospital, which she did. After their examination they advised Betty Roberts to take the child home and call the family doctor. Mrs. Roberts then took the child to the Akron Clinic. They examined her, referred her to the family doctor who, in turn, sent her again to the plaintiff-

hospital where she was received on March 22, 1960. Dr. F. T. Fiedorek of Akron was the attending physician in question at the time of her admission in March to the Children's Hospital. He testified by affidavit that at the time of the child's admission it was his opinion that she needed immediate close medical observation and hospitalization to determine the nature of her illness, which he tentatively classed as facial palsy, and what, if any, immediate treatment was indicated (Plaintiff's Exhibit 1).

It appears from the evidence that the infant was admitted to the plaintiff-hospital on March 22, 1960, and that physical examination on admission revealed an incomplete closure of the right eye, a weakness of the superior and inferior palpebrae, which indicated a right facial weakness. There was also a deviation of the lips and jaw to the left and, while a provisional diagnosis on admission was made of right facial palsy, there was still left the possibility of intracranial tumor or lesion to be ruled out. An ear, nose and throat consultant saw the patient in the hospital and a diagnosis of incomplete right facial paralysis was finally settled upon, a condition known as Bell's Palsy. Dr. Tannehill, the pediatric resident at the plaintiff-hospital, testified that the admission to the hospital was definitely necessary because of the possibility that the paralysis of the child's face was a manifestation of some severe disorder of the central nervous system but that at the close of the six-day hospitalization there was reasonable assurance that the ailment was a peripheral nerve palsy (Plaintiff's Exhibit 2). The child was finally discharged on March 28, 1960.

In July the child, while at play, fell down and hurt her wrist and her attending physician was Dr. William M. Davis of Akron, a specialist in the field of orthopedic and traumatic surgery. He testified that the child was admitted to the plaintiff-hospital as an emergency case after her accident for the reason she was then suffering from a fractured wrist and head injury. He gave it as his opinion that the child's condition at the time of her admission to plaintiff-hospital was such that she needed immediate hospitalization and medical treatment and attention, and that the situation was medically of an emergency nature and that delay would have been medically hazard-

ous (Plaintiff's Exhibits 3 and 4). She remained in the hospital for this emergency treatment and was subsequently discharged in good condition on July 26, 1960.

The evidence clearly shows that while the foster mother of the child, Betty Roberts, has never applied for or received poor relief, yet she is indigent and uncollectible so far as compensation for the hospital care is concerned. The child, of course, has no means or property of any kind.

On the date of discharge from the first admission, March 28, 1960, however, Betty Roberts signed a cognovit note in the sum of $239.00, payable on demand, to cover the child's hospital bill (Defendant's Exhibit 2), and on the date of discharge from the second admission, to-wit July 26, 1960, one Martha Darnell Roberts, a cousin of the child, signed a like document in the sum of $212.50 to cover the hospital's charges for the second hospitalization (Defendant's Exhibit 1). It does not appear in the evidence that Martha Darnell Roberts has any collectibility. It is quite clear from the evidence that the mother of the infant, Equilla Miller, left Ohio within a week or two after placing the child in the care of Betty Roberts and has never reappeared, and her whereabouts are unknown.

The plaintiff-hospital notified the welfare department of the defendant-City of Akron under date of March 23, 1960, of the infant's admission and the Welfare Department of the defendant-City refused responsibility for the hospitalization on April 19, 1960. Thereupon the plaintiff notified the Summit County Welfare Department on the 19th of April, 1960, of the March admission and that welfare department refused responsibility therefor on August 2, 1960.

On July 21, 1960, the plaintiff notified the Summit County Welfare Department of the admission of the child on July 20, 1960, and that Welfare Department refused responsibility for the hospitalization under date of August 2, 1960. Thereupon plaintiff notified the Welfare Department of the City of Akron on August 2, 1960, of the hospitalization of the child.

It appears that Betty Roberts after the last discharge of the child, as she says, made two $5.00 payments on the hospital's charges and, as Mrs. Irwin, Credit Manager of the hospital says, she made one $5.00 payment after the second discharge.

*Findings of Law*

Basically, this is a dispute between the two defendants as to which is responsible for the hospitalization of this infant. While other matters of defense are interposed by each of the defendants, it appeared, and still appears, to this Court that the real dispute is whether Summit County Welfare is responsible in this case or Akron City Welfare is responsible.

In the case of *Mansfield General Hospital* v. *Board of County Commissioners of Richland County,* 170 Ohio St., 486, the 1st proposition of the syllabus says:

"At common law no obligation rests on any public authority to furnish poor relief, and, where statutes have been enacted on the subject of poor relief, the provisions thereof govern.

This being the law, decision in this case must rest upon examination of the applicable statutes.

Section 5113.01, Revised Code, defining poor relief, states:

" 'Poor relief' means food, clothing, public or private shelter, the services of a physician or surgeon, dental care, *hospitalization,* and the maintenance of health and decency." (Emphasis added.)

The second paragraph in this section, among other things, says that poor relief is not to be given "to children who are not living with their parents, guardians, or other persons standing in place of parents."

While this is a negative provision, yet there is the clear affirmative implication that children living with persons standing in the place of parents, if otherwise eligible, are entitled to poor relief, and, under the definition in the earlier part of the section, to hospitalization. The infant here in question was certainly living with Betty Roberts, who stood in the place of a parent to her, and so stood, well nigh from the time of her birth.

Now as has been said, the basic dispute here is between the two defendants who exercise different territorial relief jurisdictions.

These areas of jurisdiction are defined in Section 5113.02, Revised Code, where it is said:

"The territory in each county outside the corporate limits of cities shall be a local relief area, referred to as the 'county local relief area,' the local relief authorities for which shall be the board of county commissioners."

Then this section goes on to say:

"Each city shall be a local relief area, the local relief authority for which shall be the proper board or officer of such city."

The infant, Lorain Miller, living with a person who stands in loco parentis, under Section 5113.01, Revised Code, is clearly entitled to hospitalization whether emergency or not, under the definition set forth in the first paragraph of that section, from one or the other of the local relief areas.

But it is said in Section 5113.04, Revised Code:

"No poor relief shall be given without a sworn application and proper investigation to determine need."

No such application or investigation was made in the instant case. Judge Zimmerman, speaking for the Supreme Court in 170 Ohio St., 486 at 488 of the opinion, referring to this section says:

"It would seem apparent that under this section 'the temporary care of transients' and 'emergency medical or hospital care' constitute the only exceptions to the requirement of a prior sworn application and proper investigation as conditions precedent to the allowance of poor relief."

However Section 5113.04, Revised Code, goes on to say, in the second sentence:

"The local relief director may approve payment for the temporary care of transients or for emergency medical or hospital care when such care has been given without a sworn application. The person or agency rendering such service shall notify the relief authority within seventy-two hours after such temporary care is given."

Because of the absence of the sworn application and proper investigation required by the statute, we are relegated to the so-called emergency provision of this enactment.

The 3rd syllabus in 170 Ohio St., 486, supra, says:

"As commonly understood, an emergency is a sudden or unexpected occurrence which demands immediate action."

Thus it is necessary to determine whether the two instances of hospitalization of this infant were occasioned by sudden or unexpected occurrences demanding immediate action.

Taking the last admission, i. e. July 20, 1960, first, it seems

there can be no question that this was a sudden and unexpected occurrence demanding immediate action, since the child fell at play and fractured a bone. It takes no great perceptive analysis to determine that this falls within the definition of emergency.

Coming now to the admission first in time, that is, the one of March 22, 1960, we have a situation where on the day before admission the foster mother, bathing the child, suddenly noticed that the child started to cry without reason, turned her head from side to side, and that the child's mouth was pulling to one side. These are rather frightening symptoms and the foster mother so regarded them, and so apparently did Dr. Fiedorek. So also did Dr. Tannehill at Children's Hospital, for the latter remarked that it was necessary to rule out the possibility of intracranial tumor or lesion, and it required that hospital, in the process of examination and diagnosis, some six days to have a reasonable assurance that this was a peripheral nerve palsy and that it was safe to discharge the patient from the hospital.

This Court has in mind that Judge Zimmerman, in 170 Ohio St., 486, supra, uses, as illustrative instances of emergency, situations such as where a person suffers an incapacitating heart attack or collapses in a diabetic coma or is struck and injured by a motor vehicle. This Court takes these statements to be illustrative and inclusive rather than exclusive. There is no difficulty in finding that where strange and frightening symptoms and manifestations suddenly occur in a child requiring some six days to make an assured diagnosis, that an emergency has arisen. Where it is necessary to rule out intracranial tumor or lesion it seems to this Court that emergency diagnosis is as much an emergency as care, after diagnosis is made. Life or wholeness of body may be in the balance and we are not disposed under such circumstances to narrow radically the definition of emergency. Accordingly, this Court has little hesitation in finding that each hospitalization constituted an emergency within the meaning of the statute. Diagnosis is prerequisite to care and treatment and is incident to emergency as well as to routine treatment.

Thus this infant was legally entitled to the hospital care she received at the expense of one or the other of the local

relief areas, even in the absence of a prior sworn application and investigation to determine the need therefor.

This makes it necessary to determine which local relief authority is responsible.

Section 5113.02, Revised Code, commands that:

"In each local relief area poor relief shall be furnished by the local relief authority to all persons therein who are eligible for such poor relief, except that * * *, *those who lack legal settlement in the county,* * * * shall be the responsibility of the county relief authority, whether living in a city or outside the corporate limits of a city." (Emphasis added.)

It is said in Section 5113.05, Revised Code:

"The legal settlement of a minor is that of the parents, surviving parent, *sole parent,* parents having custody awarded by a court, other adult having permanent custody awarded by a court, or guardian of the person of such minor * * *." (Emphasis added.)

We have here no legal settlement of the sole parent of this child in Summit County, nor does anyone connected with the child fall within the definition of the statute. Therefore, this child has no legal settlement either in Summit County or in the City of Akron. So that under the provisions quoted above of Section 5113.02, Revised Code, since the child lacks such legal settlement in the county, the responsibility becomes that of the county relief authority.

It thus appears that Summit County is the responsible relief area for payment of the hospitalization of this infant in both instances, unless it be that the provisions of notice within seventy-two hours, provided in Section 5113.04, Revised Code, has been ignored to such an extent as to bar payment. This question does not arise as to the admission in July 1960, for the undisputed evidence shows that within the seventy-two hour period the Summit County Relief Department had notice of the July hospitalization. Thus, Summit County is clearly liable for that hospitalization.

Coming to the first hospitalization, where admission was made on March 22, 1960, notice was likewise given, but to the City of Akron Relief Department, within the seventy-two hours. Akron refused responsibility on the 19th of April, 1960, and

immediately notice was given to the Summit County Welfare Department which, in turn, refused responsibility on August 2, 1960.

So we have here a situation where statutory notice within time was given to the relief area, which finally turns out not to be the responsible one, but after the expiration of the seventy-two hour period to the Summit County relief area, which it now appears is the responsible relief area. Is this compliance with the notice provision of the statute? In considering this point it is to be noted that the requirement for notice provides no special penalty as against the person or institution providing the hospitalization. That is to say, the section does not say that emergency hospital care may be given without a sworn application *provided* seventy-two hour notice shall be given. It simply imposes a duty to give such notice "to the relief authority" without requiring a very difficult determination of which area shall have notice of the hospitalization. Looking at the situation on March 22, 1960, this child was brought in as an emergency case, living at an address within the municipal relief area, and the seventy-two hour notice was given to the relief official of that area. When he had made his investigation, which apparently was the legislative purpose in making the requirement, he determined that Akron was not responsible and promptly, upon notice of that determination, the hospital notified the area that was responsible, that is, the Summit County relief area. It would seem good public policy that emergency relief be rendered, as it must be to avail, promptly. Hospitals cannot wait to make a technical determination of which relief area shall be notified. Humane considerations require promptitude in rendering hospital care in cases of emergency, and it does not appear that the Summit County relief area was in any wise prejudiced in this situation. It would, perhaps, be wise hereafter, where a hospital furnishes emergency hospital care as poor relief, that it give the seventy-two hour notice to both relief areas, but this Court is not disposed to hold that it must make choice in a complicated legal situation such as this, at its peril. It was a reasonable and a natural conclusion that since the child's residence address was in the municipal relief area notice should be given to that area's welfare department.

The Court therefore holds that the Summit County relief area is responsible for both of the subject hospitalizations, unless it be that the plaintiff should have exercised a right of appeal from a decision of the Board of County Commissioners, as claimed by such defendant in the first defense in its answer.

*Necessity of Appeal*

It is claimed by the Summit County Commissioners that the Plaintiff should have proceeded under Section 307.56, Revised Code, which provides for procedure by persons aggrieved by decision of the Board of County Commissioners.

Thus is presented the question: Should the plaintiff have made an appeal in this case under that section? This Court believes that this question is resolved by applying Section 307.55, Revised Code, which provides for the allowance and payment of claims against the county. This section says:

"No claim against the county shall be paid otherwise than upon the allowance of the board of county commissioners, upon the warrant of the county auditor, *except in those cases in which the amount due is fixed by law or is authorized to be fixed by some other person or tribunal, in which case it shall be paid upon the warrant of the auditor upon the proper certificate of the person or tribunal allowing the claim.*" (Emphasis added.)

We are now by this provision presented with the question: Is the plaintiff's claim such a one as can only be paid by the specific allowance of the board of county commissioners, or is it a claim authorized to be fixed by some other person or tribunal? The 6th paragraph in Section 5113.02, Revised Code, provides:

"Each local relief authority may appoint a relief director * * *."

It appears that each relief area here, that is, the Akron relief area and the Summit County relief area have appointed relief directors. Now Section 5113.04, Revised Code, already quoted, supra, in reference to emergency hospital care, says:

"The local relief director may approve payment for * * * emergency medical or hospital care * * *."

This seems, therefore, clearly the kind of claim authorized to be fixed by some person or tribunal other than the board of county commissioners, i. e., by the local relief director and thus is not such a claim as requires allowance specifically by the board

of commissioners, and requires no decision by that board, from which a person aggrieved needs to take an appeal. That this rule is applied by statute is evidenced by the 4th paragraph in Section 5113.02, Revised Code, where it is said:

"The county treasurer shall be the treasurer of such county local relief area, and all expenditures from the treasury of such county local relief area shall be governed by the appropriate laws relative to the expenditure of moneys in the county treasury and by Sections 5113.01 to 5113.04, inclusive, Revised Code."

It seems to the writer of this opinion that this latter provision of the code clearly authorizes construction of Sections 307.55 and 307.56, Revised Code, with the provisions relating to poor relief.

For this reason the Court finds no merit in the contention, relative to appeal, made by the County Commissioners.

There only remains the question of the claimed failure of the hospital to make an effort to secure payment of these bills by virtue of the cognovit notes (Defendant's Exhibits 1 and 2). This is raised upon the provision in the seventh sentence of Section 5113.04, Revised Code, where it is said:

"Reasonable effort shall be made to secure support from persons responsible and from other sources as a means of preventing or reducing relief at public expense."

It may be doubted whether this command of the statute relates to plaintiff. It seems, rather, to apply to the local relief authority. Nevertheless, it is clearly apparent from the record that the notes are uncollectible, although it also appears that Betty Roberts, the foster mother of the infant in question, is willing to do all that she possibly can to pay for services to this child, whom she says she loves and whom she regards as her own. Her position throughout seems to be most laudable, but she, herself, is now dependent upon a son and a sister for necessary therapy for herself. She is without means and totally uncollectible. The precautionary measure taken by the plaintiff in securing the execution and delivery of these obligations does not in any wise defeat plaintiff's suit. Such payment as Betty Roberts has made, which she says is $10.00 and the hospital says is $5.00, shall be applied as a credit, however, on her bill.

It is therefore the decision of this Court that the plaintiff

470

is entitled to recover from the defendant, Summit County Commissioners, for the first hospitalization at the rate of $31.40 per day, and for the second hospitalization at the rate of $33.52 per day. Prevailing counsel, in preparing journal entry, will compute these amounts. The City of Akron is dismissed as party defendants. Exceptions to defendant-County Commissioners.